IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | | |
|---|---|---|---|
| GARRY BROWN and JOHN HAWKINGBERRY, | ) ) ) | | |
| Plaintiffs, | ) ) | NO. 3:18-cv-00861 | |
| v. | ) ) | JUDGE RICHARDSON | |
| KNOXVILLE HMA HOLDINGS, LLC D/B/A TENNOVA HEALTHCARE, CLARKSVILLE HEALTH SYSTEM, G.P., and PROFESSIONAL ACCOUNT SERVICES, INC., | ) ) ) ) ) ) | | |
| Defendants. | ) | | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Defendants' Motion to Dismiss (Doc. No. 18, the "Motion").

Plaintiffs filed a response (Doc. No. 24), and Defendants replied (Doc. No. 25). For the reasons

stated below, the Motion will be granted.

## FACTUAL BACKGROUND

Plaintiffs Garry Brown and John Hawkingberry (collectively "Plaintiffs"), brought this

putative class action lawsuit against Defendants Knoxville HMA Holdings, LLC d/b/a Tennova

Healthcare ("Tennova Healthcare"), Clarksville Health System, G.P. (together with Tennova

Healthcare, "Tennova"), and Professional Account Services, Inc. ("PASI") (collectively

"Defendants"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO") and the Fair Debt Collection Practices Act ("FDCPA"). Plaintiffs also assert several

state law claims against Defendants including tortious interference with business relationships,

declaratory judgment under Tenn. Code Ann. § 29-14-101, *et seq.*, violation of the Tennessee

Consumer Protection Act under Tenn. Code Ann. § 47-18-101, *et seq.*, fraud, breach of contract, and unjust enrichment. [1]

Tennova is the owner and/or operator of the Tennova Healthcare–Clarksville Hospital ("Hospital"). PASI is a collection service agency hired by Tennova to provide accounts receivable collection services. When the Hospital provides treatment to a patient, it makes an initial determination regarding the reason for the treatment, including whether a third party may be liable for the patient's injuries. If the Hospital determines that a third party may be liable, Tennova enlists PASI to collect the full, unadjusted costs of the medical services provided to the patient by filing and collecting, or attempting to file and collect, one or more hospital liens that attach to any settlement or recovery the injured patient may receive from the third-party tortfeasor. In such cases, Tennova does not bill the injured patient. Likewise, it does not bill the injured patient's health insurance provider at the discounted rate(s) generally applicable to the billed services for patients covered by that insurance provider; Tennova chooses not to do so even if it is aware that the patient has valid health insurance at the time treatment is rendered.

On or about September 11, 2016, Plaintiff Brown was treated at the Hospital for injuries he sustained from an automobile accident. Brown was insured by TriCare, a health program for military veterans and their families. Tennova did not submit Brown's medical bills to TriCare for payment. Rather, Tennova instructed PASI to file a hospital lien against Brown for $2,013.07, the full, non-discounted rate for the treatment Brown received at the Hospital.

Plaintiff Hawkingberry's circumstances unfolded likewise approximately 14 months later. On or about November 21, 2017, Hawkingberry was treated at the Hospital for injuries he

---

[1] The following facts are all alleged in the Amended Complaint (Doc. No. 15) except as indicated in footnote 3 below (referring to Doc Nos. 19-1 and 19-2). For purposes of Defendants' Motion to Dismiss, the Court will accept them as true.

sustained as a result of an automobile accident that took place on November 20, 2017. Like Brown, Hawkingberry was insured by TriCare. The Hospital did not submit Hawkingberry's medical bills to TriCare for payment. Rather, the Hospital instructed PASI to file a hospital lien against Hawkingberry for $11,602.75, the full, non-discounted rate for the treatment Hawkingberry received at the Hospital.

The notice sent to each Plaintiff states that "[t]he Hospital . . . creates a lien up to the maximum allowable amount of any obtained or recovered damages which the patient or his/her legal representative may receive or be entitled to receive, whether by judgment, settlement or compromise, from any and all causes of action, suits, claims, counterclaims or demands accruing to the patient, all in accord with the provisions of the laws of the State of TN." (Doc. No. 19-1). [2]

Tennova and Plaintiffs' health insurance provider, TriCare, had entered into a provider agreement for the administration of benefits to TriCare enrollees who receive care at the Hospital. The agreement was in effect at all relevant times. Pursuant to the agreement, Tennova has an obligation to bill TriCare for services rendered to enrollees consistent with the provider agreement.

---

[2] In accepting, for purposes of the instant motion to dismiss, that the notices contained this statement, the Court relies on the documents (Doc. Nos. 19-1 and 19-2, each a "Notice" and collectively the "Notices") Defendants filed with their Motion with the representation that each was an authentic copy of the notice that PASI sent to one of the Plaintiffs informing him of the hospital lien against him. "[A]s a general rule, matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under [Federal Rule of Civil Procedure] 56." *In re Fair Finance Co.*, 834 F.3d 651, 656 n.1 (6th Cir. 2016) (citation omitted). However, the Sixth Circuit has held that "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *see also Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (holding that a district court may consider documents referenced in the pleadings that are "integral to the claims" in deciding a motion to dismiss). Because the Amended Complaint refers extensively to the Notices and because they are central to Plaintiffs' claims, the Court will consider them without converting Defendants' Motion into one for summary judgment.

Both Plaintiffs have resolved their claims with the third parties who were liable for their injuries. However, Plaintiffs cannot receive the full payments from these settlements because of the outstanding hospital liens.

## LEGAL STANDARD

For purposes of a motion to dismiss, the Court must take the factual allegations in the complaint as true, as the Court has done above. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. Identifying and setting aside such

allegations is crucial because they simply do not count toward the plaintiff's goal of showing plausibility of entitlement to relief. As suggested above, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining factual allegations plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Rule 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

**DISCUSSION**

I. **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACTION CIVIL RICO**

In Count Seven of the First Amended Class Action Complaint (Doc. No. 15, "Amended Complaint"), Plaintiffs bring a so-called civil RICO claim under 18 U.S.C. § 1964(c). "RICO provides a private cause of action for '[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter.' 18 U.S.C. § 1964(c). Section 1962, in turn, contains RICO's criminal provisions." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, *6 (2010) (citation omitted).[3] One of those criminal provisions is Section 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). In pertinent part, therefore, Section 1962(c) prohibits employees or associates of an "enterprise" from conducting the enterprise's affairs "through a pattern of racketeering activity."

---

[3] Such a private cause of action is generally known as a "RICO" or "civil RICO" action.

Plaintiffs claim that Defendants are (legal rather than natural) persons liable to them under 18 U.S.C. § 1964(c) because they have been injured by reason of Defendants' conducting of the affairs of an "enterprise" through a pattern of racketeering activity (namely, a pattern of mail fraud and wire fraud), in violation of 18 U.S.C. § 1962(c).[4]

Specifically, Plaintiffs allege that Defendants, in conducting the affairs of what Plaintiffs dub the "Tennova Unlawful Hospital Lien Enterprise," engaged in a scheme to defraud Plaintiffs and putative class members by routinely and repeatedly filing and collecting payment of unlawful hospital liens. (Doc. No. 15 ¶¶ 91-105). Plaintiffs allege that this scheme was facilitated by the use of the United States mail and wire communications, such that Defendants have committed mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively. (*Id.* ¶ 98). It is these alleged acts of mail and wire fraud that, according to Plaintiffs, constitutes the "pattern of racketeering activity" through which Defendants conducted the affairs of the "Tennova Unlawful Hospital Lien Enterprise."

To state a claim under § 1962(c), a plaintiff must show (1) conduct (2) of an enterprise (3) engaged in or affecting interstate commerce (4) through a pattern (5) of racketeering activity. *See*

---

[4] RICO declares criminal each of four different activities, which are described (and proscribed) respectively in the four subsections of 18 U.S.C. § 1962, *i.e.*, 18 U.S.C. § 1962(a)-(d). Notably, the activity that 18 U.S.C. § 1962(d) outlaws is conspiring to commit any of the crimes proscribed by 18 U.S.C. § 1962(a)-(d). Like most civil RICO plaintiffs, Plaintiffs ignore 18 U.S.C. § 1962(a) and (b). Instead, as indicated above, they rely on 18 U.S.C. § 1962(c). At one point in the Amended Complaint, they make an isolated and extraneous reference to 18 U.S.C. § 1962(d). (Doc. No. 15 ¶ 104). However, they fail to make any allegations to support any claim of a RICO conspiracy violative of 18 U.S.C. § 1962(d), and thus the Court does not countenance any such claim. Thus, Plaintiffs' civil RICO claim is based on an alleged violation of 18 U.S.C. § 1962(c), and only 18 U.S.C. § 1962(c). And even if it the Amended Complaint were properly deemed to include a claim under 18 U.S.C. § 1962(d), that claim would fail because, as discussed below, the claim under 18 U.S.C. § 1962(c) fails. *Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Georgia*, 768 F. App'x 446, 459 (6th Cir. 2019) ("Because plaintiffs failed to plausibly allege a violation of § 1962(b) or (c), the district court properly dismissed the RICO conspiracy claim as well.").

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Defendants contend that Plaintiffs' allegations fail to satisfy the fifth factor—that Defendants engaged in racketeering activity. In order to adequately plead that defendants (acting on behalf of the RICO enterprise) engaged in a "pattern of racketeering activity," a plaintiff must allege that the defendants committed at least two predicate acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5). The alleged predicate acts may consist of any act which is indictable under a number of specified federal statutes, including, as alleged here, the mail and wire fraud statutes. *See* 18 U.S.C. § 1961(1) (defining racketeering activity).

"The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here." *See Carpenter v. United States,* 484 U.S. 19, 25 n.6 (1987); *United States v. Daniel*, 329 F.3d 480, 486 n.1 (6th Cir. 2003) (quoting *Carpenter*). "The construction of the mail and wire fraud statutes should be identical 'with the sole distinction between the crimes being the interstate communication device [mail versus interstate wires] utilized by the alleged offender.'" *Physicians Weight Loss Centers of Am. v. Creighton*, No. 90-CV-2066, 1992 WL 176992 (N.D. Ohio Mar. 30, 1992) (quoting *Van Dorn Company, Central States Can Co. Division v. Howington,* 623 F. Supp. 1548, 1555 (N.D. Ohio 1985)).

Mail and wire fraud consist of "(1) a scheme or artifice to defraud; (2) use of the mails or interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 264 (6th Cir. 2014) (citing *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006)). Plaintiffs alleging RICO violations based on the predicate acts of mail or wire fraud must "meet the more rigorous pleading standards of [Federal Rule of Civil Procedure 9(b),]" which provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

*Heinrich v. Waiting Angels Adoption Servs. Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting Fed. R. Civ. P. 9(b)).

Plaintiffs allege that Tennova and PASI conducted the affairs of an association-in-fact enterprise,[5] the "Tennova Unlawful Hospital Lien Enterprise." (Doc. No. 15 ¶¶ 92-93). Plaintiffs assert that Defendants did so through a pattern of racketeering activity (multiple acts of mail fraud and wire fraud) by filing and collecting unlawful hospital liens despite knowing that the amounts sought are unlawful under the Tennessee Hospitals' Lien Act ("HLA"), Tenn. Code Ann. § 29-22-101, *et seq*. According to Plaintiffs, the Tennessee Supreme Court's decision in *West v. Shelby Cty. Healthcare Corp.*, 459 S.W.3d 33 (Tenn. 2014) makes clear that the liens are unlawful under the HLA. Plaintiffs allege that in spite of this clear precedent, Defendants carried out their fraudulent scheme of collecting payment of unlawful hospital liens, utilizing the United States mail and interstate wire communications in furtherance thereof. (Doc. No. 15 ¶ 98).

Defendants argue that Plaintiffs' RICO claim fails because the alleged wrongdoing does not constitute racketeering activity within the scope of RICO. (Doc. No. 19 at 19-20). In particular, Defendants dispute that the hospital liens are unlawful under the HLA. According to Defendants, Plaintiffs' synopsis of the Tennessee Supreme Court's decision in *West* is inaccurate and overly broad. Defendants further argue that RICO does not apply to garden-variety disputes over the application of the law, which (according to them) is the key inquiry here because the legality of the hospital liens turns on the parties' conflicting interpretations of *West*.

---

[5] An "enterprise" within the meaning of (and for purposes of) RICO (a "RICO enterprise") can be an "individual, partnership, corporation, association, or other legal entity, [or] any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). The last option on this list is known as an "association-in-fact," which is the kind of enterprise Plaintiffs allege here.

The Court concludes that Plaintiffs' RICO claim fails because Plaintiffs have not sufficiently alleged the predicate crimes of mail and wire fraud, in that they have not sufficiently alleged that Defendants engaged in a scheme to defraud. "A scheme to defraud is any plan or course of action by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (internal quotation marks omitted). The Sixth Circuit has held that a scheme to defraud must involve:

> *[I]ntentional* fraud, consisting in deception *intentionally* practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. [*A scheme to defraud*] *requires intent to deceive or defraud.*

*Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) (quoting *Epstein v. United States*, 174 F.2d 754, 765 (6th Cir.1949)). Thus, to state a civil RICO claim based on mail or wire fraud, plaintiffs "must allege that Defendants possessed the 'specific intent to deceive or defraud.'" *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1082 (E.D. Mich. 2018) (quoting *United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997)).[6] Relatedly, a fraudulent scheme must include a material misrepresentation. *Petlechkov*, 922 F.3d at 766.

---

[6] The Sixth Circuit has also held that the scheme "must involve misrepresentations or omissions *reasonably calculated to deceive persons of ordinary prudence and comprehension.*" *United States v. Jamieson*, 427 F.3d 394, 415 (6th Cir. 2005) (quoting *Berent v. Kemper Corp.*, 973 F.2d 1291, 1294 (6th Cir. 1992)) (emphasis added). Although some may say that this principle favors the unscrupulous at the expense of the unsophisticated, the Sixth Circuit has adhered to it. *See*, e.g.*, United States v. Petlechkov*, 922 F.3d 762, 766 (6th Cir. 2019); *United States v. Bohn*, 281 F. App'x 430, 440 (6th Cir. 2008). In any event, this case does not turn on whether misrepresentations or omissions made by Defendants were "reasonably calculated to deceive persons of ordinary prudence and comprehension," but rather on whether Defendants made any fraudulent or deceitful representations at all. Likewise, although, as suggested in *Jamieson* and explained in *Duramax Diesel Litig.*, 298 F. Supp. 3d at 1055, the predicate crimes of mail and wire fraud can result from fraudulent omissions, Plaintiffs here do not allege any fraudulent omissions and instead rely solely upon alleged affirmative fraudulent misrepresentations.

Although Plaintiffs allege that the Notices contained false and fraudulent representations (Doc. No. 15 ¶¶ 98-99), Plaintiffs fail to identify any language, or even any general message, in the Notices that in fact constitutes a representation that is false or fraudulent. Specifically, Plaintiffs' allege that Defendants "falsely represented to Plaintiffs and Class members that the hospital liens at issue constitute valid, lawfully owed debts." (*Id.* ¶ 99). This allegation is dependent on Plaintiffs' assertion that Tennessee law does in fact bar Defendants from asserting the liens at issue; thus, if Plaintiffs' assertion is invalid, then Defendants' alleged representation was not false. And as further discussed below, the Court finds that neither the HLA nor Tennessee state precedent make clear that the liens are unlawful. Therefore, Plaintiffs fail to sufficiently allege that Defendants' Notices contained any misrepresentation, and thus fail to allege that Defendants engaged in a scheme to defraud.

The HLA expressly provides that when a hospital treats a patient who was injured by a third party's negligence, the hospital "shall have a lien" on the patient's tort claim in the amount of "all reasonable and necessary charges for hospital care, treatment and maintenance of . . . injured persons." Tenn. Code Ann. § 29-22-101(a). But Plaintiffs allege that the liens filed by PASI on behalf of Tennova do not fall under the HLA provision because the full, non-negotiated rates for Plaintiffs' treatments are not the "reasonable and necessary charges." *Id.* According to Plaintiffs, in *West*, the Tennessee Supreme Court "rejected the idea that under Tennessee's [HLA] hospitals can file liens against insured patients in excess of the discounted rates provided in contracts between the hospital and the insured's health insurer" (Doc. No. 24 at 3), because "'reasonable charges' are the charges agreed to by the insurance company and the hospital" (Doc. No. 15 at 5 (quoting *West*, 459 S.W.3d at 46)). Unsurprisingly, Defendants interpret *West* more narrowly, arguing that the holding is limited to the facts of the particular case. Specifically, Defendants argue

that *West* prohibits hospitals from asserting liens for the full, non-negotiated rates only "when a hospital has billed the health insurance carrier, received payment from the carrier at the lower negotiated reimbursement rate (. . . ), but still maintained hospital liens for the remainder of the non-discounted billed charges." (Doc. No. 19 at 3).

A close reading of *West* and subsequent Tennessee Supreme Court cases confirms that Defendants' narrow interpretation of *West* is objectively reasonable. In *West*, the Tennessee Supreme Court considered "the ability of a hospital to use a hospital lien to recover from a third-party tortfeasor the unadjusted cost of the medical services it provided to a patient whose injuries were caused by the third party." *West*, 459 S.W.3d at 36-37. However, in *West*, unlike here, the defendant hospital charged and received payment for the full amount of the lower, adjusted charges from the two plaintiffs' insurance companies. *Id.* at 37.[7] Despite receiving these payments, the defendant hospital refused to release the hospital liens for the full, unadjusted cost of the medical services against the plaintiffs that it sought under the HLA. In a subsequent decision, the Tennessee Supreme Court summarized its decision in *West* as holding that "'reasonable charges' for medical services under Tennessee's [HLA], are the discounted amounts a hospital *accepts* as full payment from patients' private insurers, not the full, undiscounted amounts billed to patients." *Dedmon v. Steelman*, 535 S.W.3d 431, 433 (Tenn. 2017) (emphasis added).[8] Notably, in *West*, the Tennessee

---

[7] In *West*, three patients injured in separate accidents and treated at Regional Medical Center at Memphis filed suit in the Circuit Court for Shelby County. The trial court dismissed the suit on the merits, and the patients appealed to the Court of Appeals, which reversed the trial court. The Tennessee Supreme Court granted the defendant hospital's Tenn. R. App. P. 11 application for permission to appeal but limited the appeal to two of the three patients' cases. *West*, 459 S.W.3d at 38 n.1.

[8] The parties offer conflicting analyses regarding the significance of the Tennessee Supreme Court's decision in *Dedmon*. Defendants argue that *Dedmon* confirms that *West's* holding is limited to the facts of that particular case. (Doc. No. 19 at 9). Defendants also argue that "[i]n *Dedmon*, the Tennessee Supreme Court noted that the *West* court's description of 'full,

Supreme Court held that the plaintiff who had not paid an outstanding copayment to the hospital had not fully satisfied her debt, and therefore was not entitled to have the lien against her extinguished. The Court so concluded even though the lien was for the higher, unadjusted cost of medical services provided to the plaintiff. Thus, the Court finds that Tennessee Supreme Court precedent is ambiguous as to the legality of a lien in excess of the discounted rate to which insured patients purportedly are entitled, *when the hospital has not billed, or been paid in full by, the patient or the patient's health care provider (or both of them)*.

As stated above, to adequately allege a scheme to defraud, Plaintiffs must point to some misrepresentation involved in Defendants' alleged scheme. Here, Plaintiffs' claim that Defendants engaged in a scheme to defraud is dependent on the assertion that Tennessee law bars Defendants from asserting the liens at issue. However, because neither the HLA nor *West* make it objectively clear that the liens are unlawful, Plaintiffs fail to allege that Defendants engaged a scheme to defraud with the specific intent to defraud. Indeed, Defendants' representations regarding the legality of the hospital liens and Plaintiffs' duty to pay could not have been false or fraudulent because there is no statute or precedent that makes clear that the liens are unlawful.

Even accepting the possibility that the Tennessee Supreme Court subsequently will proclaim that liens like Defendants' are unlawful under *West*, Plaintiffs' allegation that Defendants

---

undiscounted medical bills' as 'not reasonable' was 'overly broad.'" (Doc. No. 19 at 3 (quoting *Dedmon*, 535 S.W.3d at 449)). Plaintiffs disagree, arguing that *Dedmon* supports their assertion that hospital liens against insured individuals in the amount of the non-discounted rates is unlawful. Plaintiffs point to language in the *Dedmon* opinion that states, "*West* ultimately held that 'reasonable charges' for purposes of the HLA are the discounted amounts that a hospital agrees to accept from the patient's private insurer." (Doc. No. 24 at 13 (quoting *Dedmon*, 535 S.W.3d at 448)). The Court finds that the conflicting language in *Dedmon* does not make clear that hospital liens for amounts in excess of the rates negotiated between the hospital and insurance provider are unlawful. Indeed, the parties' citations to conflicting language suggests that the scope of *West* is not clarified by the Tennessee Supreme Court's subsequent decision.

engaged in false and fraudulent representations still fails. As noted in the Sixth Circuit pattern jury instructions for mail fraud and for wire fraud, "[t]he term 'false or fraudulent pretenses, representations or promises' means any false statements or assertions that concern a material aspect of the matter in question, *that were either known to be untrue when made or made with reckless indifference to their truth.*" Sixth Circuit Pattern Jury Instructions 10.01(2)(B) & 10.02(2)(B) (emphasis added). Even such a subsequent proclamation by the Tennessee Supreme Court would not somehow retroactively render Defendants' representation of the validity of their liens untrue "when made." Still less would it mean that Defendants knew *at the time the representations were made* that they were untrue or even that they acted with reckless indifference to their truth *at such time*. Plaintiffs do not and can not sufficiently allege that at the times in question, Defendants knew or recklessly disregarded that the lien amounts sought in the Notices were unlawful under the HLA and precedential Tennessee case law. In short, at the time in question, the alleged false representations were not false, let alone knowingly or recklessly false. And therefore the allegations regarding mail and wire fraud, and the civil RICO claim predicated on them, are simply a non-starter.

Defendants' principal argument against Plaintiffs' RICO claim is consistent with the above analysis, but it supplies something additional and is meritorious in its own right. Defendants argue that RICO does not apply to disputes over interpretation of certain Tennessee Supreme Court decisions. (Doc. No. 19 at 19-20). In support of their argument, Defendants point to *Schulenberg v. Rawlings Co.*, No. CVN03-0134, 2003 WL 22129230 (D. Nev. Aug. 20, 2003), a RICO action, which they contend addresses a nearly identical factual situation. (Doc. No. 19 at 19-20). In *Schulenberg*, the plaintiff, a health plan beneficiary, alleged that existing Ninth Circuit precedent barred the plan fiduciary from asserting a lien for reimbursement of medical expenses from the

proceeds of the plaintiff's settlement with a third-party tortfeasor, meaning that the plan fiduciary's collection efforts were in violation of the mail fraud and wire fraud statutes. The court dismissed the plaintiffs' civil RICO claim, reasoning:

> Here, although there is no statute involved, Schulenberg's claim is dependent on the assertion that Ninth Circuit law bars the [d]efendant from asserting a lien. As indicated above it does not. The alleged acts of mail and wire fraud simply represent a dispute over application of the law, which is an insufficient legal basis to assert a RICO claim.

*Schulenberg*, 2003 WL 22129230, at *7 (D. Nev. Aug. 20, 2003).

In addition, in *Grauberger v. St. Francis Hospital*, 169 F. Supp. 2d 1172 (N.D. Cal. 2001), a case favorably cited in *Schulenberg,* an insured plaintiff was injured in an automobile accident and was treated for her injuries by the defendant hospital. *Id.* at 1175. Although the plaintiff's insurance provider paid the hospital at the negotiated rate and the plaintiff paid the deductible amounts and copayments, the hospital filed a lien pursuant to California's HLA, seeking to recover the difference between the hospital's full, non-negotiated charges and the lower, negotiated rates that the plaintiff's insurance provider had already paid. *Id.* The plaintiff filed suit against the hospital and health care organization asserting, *inter alia*, violations of RICO (predicated on mail fraud), because the hospital's demand for greater compensation than it had agreed to accept under the contract constituted mail fraud. *Id.*[9]

The court determined that even though it found (after the suit was filed but before a final decision was rendered) that the lien was not authorized by California's HLA, the allegations that

---

[9] Before ruling on the defendant's motion to dismiss, the district court decided to address the validity of the lien—by separate order, the court held that California's HLA did not entitle hospitals to file liens against a patient's settlement proceeds at the full non-negotiated rate after the patient's insurer had paid the hospital at the negotiated rate. *Grauberger v. St. Frances Hospital*, 149 F. Supp. 2d 1186, 1194 (N.D. Cal. Jun. 15, 2001).

the defendants had filed fraudulent liens and engaged in a double billing scheme were insufficient to demonstrate that the defendants engaged in a scheme to defraud the plaintiff. *Grauberger*, 169 F. Supp. 2d at 1176-77. The court also held that "plaintiff's claim, at bottom, turns on issues of statutory interpretation [of the HLA]." *Id.* at 1177. "Surely," the court stated, "Congress did not intend to turn garden variety disputes over statutory interpretation into criminal acts sufficient to justify a RICO claim." *Id.*[10]

The Court finds persuasive the holdings in *Schulenberg* and *Grauberger*. The Court agrees that Congress did not intend for RICO to apply to garden variety disputes over statutory interpretation (*Grauberger*) or disputes over the application of the law (*Schulenberg*). However, it is important to note that these types of disputes do not fail to give rise to a civil RICO claim simply because Congress did not intend them to. Rather, they fail primarily because civil RICO claims predicated on mail or wire fraud require plaintiffs to sufficiently allege a scheme to defraud and thus false representations made with knowledge or in reckless disregard of their falsity—and as a matter of law, no such false representation is made by a defendant who merely asserts a colorable reasonable interpretation of a statute or precedent. *Unreasonable* interpretations perhaps may, under certain circumstances, fall with the reach of the mail fraud and wire fraud statutes and thus

---

[10] The Court realizes that *Grauberger* is distinguishable from the facts here to the extent that there was no published state law precedent on the issue of whether California's HLA permitted the type of liens filed by the defendant hospital. *Id.* at 1177. In comparison, Plaintiffs here argue that the Tennessee Supreme Court's holding in *West* makes clear that under the HLA, liens against insured patients in excess of the discounted rates provided in contracts between the hospital and the insured's health insurer is unlawful. (Doc. No. 24 at 3). As discussed above, the Court finds that *West*'s holding is not as clear as Plaintiffs suggest. Accordingly, whether the hospital lien was lawful turns upon the parties' conflicting and reasonable interpretations of published Tennessee state law precedent. Therefore, like the *Grauberger* court's finding with respect to issues of statutory interpretation, the Court does not believe that Congress intended RICO to apply to garden variety disputes over objectively reasonable interpretations of existing case law.

support civil RICO claims. But this case does not involve Defendants' assertion of an unreasonable interpretation.

Even drawing all inferences in Plaintiffs' favor,[11] the Amended Complaint fails to allege that Defendants made false or fraudulent representations regarding the legality of the hospital liens because neither state law nor existing Tennessee state court precedent make clear that the liens are unlawful. Accordingly, Defendants' Motion to Dismiss Count VII of the Amended Complaint will be granted.[12]

## II. Violation of the Federal Fair Debt Collection Practices Act

In Count Eight of the Amended Complaint, Plaintiffs allege that Defendant "PASI has used, and continues to use, false, deceptive, and misleading representations and means in connection with the collection of hospital liens under the HLA in violation of §§ 1692e, 1692e(2)(A), 1692e(5), and 1692e(10)" of the Fair Debt Collection Practices Act, 15 U.S.C. 1692, *et seq.* ("FDCPA"). The FDCPA was passed by Congress to protect consumers from "abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). To establish a claim under the FDCPA, "a plaintiff must allege (1) that he or she is a 'consumer' as defined by the Act; (2) that the 'debt' arises out of transactions that are primarily for personal,

---

[11] The Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff," but "need not accept as true legal conclusions or unwarranted factual inferences ... and [c]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (citations and quotation marks omitted). Here, Plaintiffs' allegation that the liens at issue were unlawful under precedential Tennessee case law is not an inference that the Court must accept.

[12] The Court notes that it perceives several additional issues with Plaintiffs' civil RICO claim, one or more of which could independently be fatal. But given the Court's dismissal of this claim on the particular ground discussed, the Court need not address these other issues or opine as to whether they doom Plaintiffs' civil RICO claim.

family, or household purposes; (3) that the defendant is a 'debt collector' as defined by the Act; and (4) that the defendant violated § 1692e's prohibitions." *Smith v. Nationstar Mortg., LLC*, 756 F. App'x 532, 535-36 (6th Cir. 2018) (citing *Wallace v. Wash. Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012)).

Defendants argue that Plaintiffs have failed to state a claim under the FDCPA because (1) PASI does not qualify as a "debt collector" pursuant to the FDCPA; (2) Plaintiff Brown's claim is barred by the FDCPA's one-year statute of limitations; and (3) filing a hospital lien does not constitute the enforcement of an obligation to pay money against the debtor himself; rather, the lien is filed "'upon any and all causes of action, suits, claims, counterclaims or demands accruing to the person to whom such care, treatment or maintenance was furnished.' Tenn. Code Ann. § 29-22-101(a)." (Doc. No. 19 at 17-19). Because the Court finds that Plaintiffs have not alleged facts demonstrating that PASI qualifies as a "debt collector" within the meaning of the FDCPA, it need not address Defendants' other arguments attacking Plaintiffs' FDCPA claim.[13]

Under the FDCPA, a "debtor collector" includes: (1) "any person who uses an instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts"; or (2) any person "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). However, the term "debt collector" specifically exempts "any person collecting or

---

[13] In their Response, Plaintiffs assert that "PASI does not and cannot contest that it is a debt collector subject to the FDCPA." (Doc. No. 24 at 17). The Court is baffled by Plaintiffs' assertion that PASI does not contest that it is a debt collector. To the contrary, the argument that PASI is exempt from the definition of a "debt collector" under the FDCPA is Defendants' main argument in support of their motion to dismiss Count Eight. (*See* Doc. No. 19 at 17-18). Indeed, Defendants dedicate nearly a page and a half of their 25 page memorandum to this argument, including a three paragraph block quote. (*Id.*).

attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692a(6)(F)(iii); *see also Meadows v. Caliber Home Loans*, 2019 WL 1242667, at *4 (M.D. Tenn. Mar. 18, 2019) (Crenshaw, J.) (finding that defendant was not a "debt collector" under the FDCPA where "plaintiffs were in good standing when [the defendant] assumed their mortgage and only encountered financial difficulties thereafter"); *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 910 (S.D. Ohio 2013) (finding that a loan servicer was not a "debt collector" under the FDCPA where "the debt was assigned for servicing before default of the loan . . ."). PASI falls within the scope of this exemption.

The Court finds instructive *Geiger v. Fla. Hosp. Mem'l Med. Ctr.*, No. 6:16-cv-1477, 2017 WL 1177310, at *3 (M.D. Fla. Mar. 29, 2017). As Defendants point out, *Geiger* addresses "a nearly identical situation involving hospital liens" which "dismissed the FDCPA claims because the alleged 'debt collector'—the equivalent of PASI in this case—obtained the debt before the debt was in default." (Doc. No. 19 at 17). In *Geiger*, each of two insured plaintiffs received medical care at the defendant hospital. Two days after the insured plaintiff received treatment and before the underlying debt was in default, defendant Accelerated Claims Inc. ("ACI"), acting on behalf of the defendant hospital, sent the plaintiffs a copy of the hospital liens (to secure payment for medical services rendered by the defendant hospital) upon any proceeds arising from insurance. Citing *Carter v. AMC, LLC*, 645 F.3d 840, 843 (7th Cir. 2011), in which the Seventh Circuit "grappled with the difficult question of whether an agent who is authorized to undertake collection activity has 'obtained' a debt", *Geiger*, 2017 WL 1177310, at *4, the court held that ACI had

"obtained" the debt underlying the hospital lien for purposes of the 15 U.S.C. § 1692a(6)(F)(iii) exemption. *Id.*[14]

Similarly, Plaintiffs here have not alleged facts demonstrating that PASI qualifies as a "debt collector" within the meaning of the FDCPA. Specifically, the Amended Complaint alleges the following sequence of events: first, Plaintiffs Brown and Hawkingberry received treatment at Tennova on September 11, 2016 and November 21, 2017, respectively (Doc. No. 15 ¶¶ 11-12); second, "[i]nstead of submitting [plaintiffs'] medical bills to [their insurers] for payment, Tennova sought collection of a purported debt by instructing PASI to file a hospital lien . . ." (*id.* at ¶¶ 26, 34); and, third, PASI did in fact file the hospital liens on Tennova's behalf, (*id.* ¶ 27). Conspicuously absent is any allegation of Plaintiffs being in default at any time,[15] let alone in

---

[14] In *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017), the Supreme Court discussed the scope of the term "obtained" within the § 1692a(6)(F)(iii) exemption. *Id.* at 1723. Specifically, the Court stated:

> As a matter of ordinary English, the word "obtained" can (and often does) refer to taking possession of a piece of property without also taking ownership—so, for example, you might obtain a rental car or a hotel room or an apartment. *See, e.g.*, 10 Oxford English Dictionary 669 (2d ed. 1989) (defining "obtain" to mean, among other things, "[t]o come into the possession or enjoyment of (something) by one's own effort or by request"); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 532–533 [] (2013) (distinguishing between ownership and obtaining possession). And it's easy enough to see how you might also come to possess (obtain) a debt without taking ownership of it. You might, for example, take possession of a debt for servicing and collection even while the debt formally remains owed another. Or as a secured party you might take possession of a debt as collateral, again without taking full ownership of it. *See, e.g.*, U.C.C. § 9–207, 3 U.L.A. 197 (2010). So it simply isn't the case that the statute's exclusions imply that the phrase "owed ... another" must refer to debts previously owed to another.

*Id.*

[15] Referring to the Notices (Doc. Nos. 19-1-19-2), Defendants argue that "Plaintiff Brown received medical care on September 11, 2016 and the Notice is dated November 3, 2016 . . . Plaintiff Hawkingberry received medical care on November 21, 2017 and the Notice is dated less than a month later on December 15, 2017[.]" (Doc. No. 19 at 18 n.7). Although the Court does not know

default at the time PASI "obtained" the debt, which (as *Geiger* tends to suggest) was the time PASI allegedly became authorized to undertake collection activity on the debt; it is unclear what when this occurred, but at the latest it would have been at the time Tennova allegedly "instruct[ed] PASI to file the hospital lien." (*Id.* at ¶ 26).[16] And in fact, the Amended Complaint affirmatively suggests that each Plaintiff was not, and not even viewed by Defendants, as in default at that time. Rather, as to each Plaintiff, the Amended Complaint clearly alleges that Defendants had not even billed such Plaintiff—let alone asserted that he was in default—at that time.

Accordingly, the Amended Complaint fails to plausibly allege that PASI is a "debt collector" for purposes of, and as required for liability under, the FDCPA. On this basis, Defendants' Motion to Dismiss the Amended Complaint will be granted as to Count VIII.

### III. Jurisdiction Over State Law Claims

Plaintiffs also assert several state law claims against Defendants including tortious interference with business relationships, declaratory judgment under Tenn. Code Ann. § 29-14-101, *et seq.*, violation of the Tennessee Consumer Protection Act under Tenn. Code Ann. § 47-18-101, *et seq.*, fraud, breach of contract, and unjust enrichment. (Doc. No. 15 at 12-22).

A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3); *see also Ford v. Frame*, 3 F. App'x 316, 318 (6th Cir. 2001) ("[D]istrict courts possess broad discretion in determining whether to retain supplemental jurisdiction over state claims once all federal claims are

---

when the debt underlying Plaintiffs' liens became due, the short time between the dates of treatment and the Notices supports the notion that Plaintiffs were not in default.

[16] The Amended Complaint does not indicate when this time was with respect to either Plaintiff; to the extent it suggests anything, it suggests that it was (at the latest) when Tennova instructed PASI to file the hospital lien for each Plaintiff (Doc. No. 15 ¶¶ 26, 34). However, the date this allegedly occurred was not stated in the Amended Complaint.

dismissed."). The Supreme Court has noted that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."). The sole basis for subject matter jurisdiction in the Amended Complaint is federal question jurisdiction under 28 U.S.C. § 1331.[17] Plaintiff does not assert any factual allegations giving rise to diversity jurisdiction, and indeed the Amended Complaint is explicit as to the lack of diversity of citizenship of the parties. (Doc. No. 15 ¶¶ 11-15 (alleging that all parties are from Tennessee)). Having granted Defendants' Motion to Dismiss Plaintiffs' RICO and FDCPA claims (over which the Court has original jurisdiction) and because the parties are non-diverse, and the aforementioned factors weigh in favor of declining jurisdiction over Plaintiffs' state law claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismisses them without prejudice. Plaintiffs may seek to refile them in a Tennessee state court.

---

[17] In their Amended Complaint, Plaintiffs assert that this Court has subject-matter jurisdiction pursuant to Rule 23 of the Tennessee Rules of Civil Procedure and the Hospitals' Liens Act, Tenn. Code Ann. § 29-22-101, *et seq*. There is nothing in either Rule 23 of the Tennessee Rules of Civil Procedure or the HLA that provides this Court with subject-matter jurisdiction. Although Plaintiffs failed to correctly assert this Court's basis for subject-matter jurisdiction, the Court did not automatically dismiss the complaint because "the complaint plead[ed] facts from which federal jurisdiction [could] be inferred." *Harary v. Blumenthal*, 555 F.2d 1113, 1115 n.1 (2d Cir. 1977) ("When the complaint pleads facts from which federal jurisdiction may be inferred . . . the insufficiency of the jurisdictional allegation is not controlling, and the action need not be dismissed.") (citations omitted); *see also AmSouth Bank v. Dale*, 386 F.3d 763, 779 (6th Cir. 2004) ("Affirmative pleading of the precise statutory basis for federal subject matter jurisdiction is not required as long as a complaint alleges sufficient facts to establish jurisdiction.") (quoting *In re Mailman Steam Carpet Cleaning Corp.*, 196 F.3d 1, 5 (1st Cir. 1999)).

**CONCLUSION**

For the foregoing reasons, the Court will **GRANT** Defendants' Motion to Dismiss. (Doc. No. 18). Plaintiffs' federal claims, a civil RICO claim (Count VII) and a claim under the FDCPA (Count VIII), will be **DISMISSED with prejudice**. The Court, in its discretion declines to exercise jurisdiction over Plaintiffs' state law claims (Counts I-VI),[18] pursuant to 28 U.S.C. § 1367(c)(3), and Plaintiffs' state law claims will be **DISMISSED without prejudice**, so that Plaintiffs may seek to file them in a Tennessee state court.

An appropriate order will be entered.

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[18] The Court treats Count II as a state claim because, even though a claim for declaratory relief in federal court should be (and typically is) a federal claim brought under the Federal Declaratory Judgments Act, 28 U.S.C. § 2201 *et seq.*, Plaintiffs are the masters of their own complaint. *Heyne v. Metro. Bd. of Pub. Educ.*, No. 3:09-1041, 2009 WL 3765174, at *1 (M.D. Tenn. Nov. 9, 2009), and Plaintiffs chose to plead this claim under state law.